## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| INTER-LOCAL PENSION FUND GRAPHIC | ) | |
| COMMUNICATIONS CONFERENCE OF THE | ) | |
| INTERNATIONAL BROTHERHOOD OF | ) | |
| TEAMSTERS, on Behalf | ) | |
| Of Itself and all Others Similarly Situated, | ) | |
| | ) | No. |
| *Plaintiff*, | ) | |
| | ) | **CLASS ACTION COMPLAINT** |
| vs. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| BANK OF AMERICA CORPORATION; | ) | |
| BANK OF AMERICA, N.A.; MERRILL LYNCH, | ) | |
| PIERCE, FENNER & SMITH, | ) | |
| INC.; BANK OF | ) | |
| AMERICA MERRILL LYNCH | ) | |
| INTERNATIONAL LIMITED; CRÉDIT | ) | |
| AGRICOLE S.A.; CRÉDIT | ) | |
| AGRICOLE CORPORATE AND | ) | |
| INVESTMENT BANK; | ) | |
| CREDIT SUISSE GROUP AG; | ) | |
| CREDIT SUISSE AG; CREDIT | ) | |
| SUISSE INTERNATIONAL; CREDIT SUISSE | ) | |
| SECURITIES (USA) LLC; DEUTSCHE | ) | |
| BANK AG; DEUTSCHE BANK SECURITIES | ) | |
| INC.; NOMURA INTERNATIONAL PLC; | ) | |
| NOMURA HOLDINGS, INC.; NOMURA | ) | |
| SECURITIES INTERNATIONAL, INC.; | ) | |
| HIREN GUDKA; BHARDEEP SINGH HEER; | ) | |
| AMANDEEP SINGH MANKU; and | ) | |
| SHAILEN PAU, | ) | |
| | ) | |
| *Defendants*. | ) | |

1

This action is brought by Plaintiff Inter-Local Pension Fund Graphic Communications Conference of the International Brotherhood of Teamsters (the "Pension Fund" or "Plaintiff"), on behalf of itself and all others similarly situated, to recover treble damages and other appropriate relief based on Defendants' unlawful conspiracy, from at least as early as January 1, 2005, to fix, raise, maintain, stabilize and/or otherwise manipulate the prices for supranational, sub-sovereign, and agency ("SSA") bonds sold to and purchased from investors in the secondary market. As set forth below, Defendants' conspiracy violates the federal antitrust laws, and in particular, Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Sherman Act").

## INTRODUCTION AND OVERVIEW

1.      Government entities issue debt in the form of bonds, which are typically used to fund ongoing and future operations.

2.      As with other bonds, SSA bonds are issued through one or more banks, which are charged with creating a market for the issue. This entails, among other things, judging investor demand for these products and the price at which they can be sold, and ultimately, distributing (selling) the bonds to the public.  This process is known as "underwriting."

3.      Appointment as a lead or managing underwriter is usually a competitive process among banks, with each bank submitting bids to SSA bond issuers for underwriting services. Bonds are often underwritten by a group of banks called a "syndicate," with certain banks having a larger responsibility in underwriting the bond issue than others.

4.      Banks selected to perform underwriting services earn a fee for these services, as well as profits from the sale of the SSA bond issuer's bonds.

5.      A variety of international entities issue SSA bonds, including, among others: provinces and states; regional development banks; infrastructure borrowers such as highway and bridge authorities; social security funds; export creditors; and rail sector entities. Typically, SSA

2

bonds are seen as "vehicles for growth."[1] International issuers sometimes issue their debt in currencies different from their local currency, including U.S. dollars, to take advantage of potentially lower all-in funding costs, as well as to broaden the potential pool of investors to which these bonds can be sold. The global SSA bond market is substantial, as it ranges from $9 to $15 trillion[2], with global SSA issuance volumes reaching $843.35 billion for the year 2015.[3]

6.     The sale of bonds in the initial offering is known as the "primary market."  Major participants in the primary market for SSA bonds include major financial institutions, pension funds, mutual funds, hedge funds, insurance companies, foundations, state and local governments, foreign central banks, institutional investors, and at times, the underwriters themselves.

7.     An investor, such as Plaintiff, that did not purchase SSA bonds in the primary market, must purchase them on the "secondary market," *i.e.*, post-bond issuance. Major participants in the secondary market for SSA bonds include institutional investors, mutual funds, hedge funds, and pension funds.

8.     Entities typically invest in SSA bonds because SSA bonds are generally regarded as highly secure investments and are considered to be low-risk, *i.e.*, investments with a low risk of default. As a result of the recent global economic crises, investors have increasingly turned to the SSA bond market because of SSA bonds' relatively low risk profiles.

---

[1] Matthew Cairns, "The SSA market: an investor primer," *Investment Essentials*, Research & Investment Strategy - Weekly Comment (June 28, 2012), at 2, https://www.axa-im.com/en/publications/-/news/research-research-and-strategy-weekly-ssa-market/maximized/k6Rb (last viewed June 22, 2016).
[2] David McLaughlin & Tom Schoenberg, "U.S. Said to Probe Possible Rigging in Agency Bond Market," *Bloomberg* (Dec. 9, 2015), http://bloom.bg/1RaD1OR (last viewed June 16, 2016).
[3] Abhinav Ramnarayan & Helene Durand, "EXCLUSIVE - DoJ investigates bond traders over market-rigging," Int'l Fin. Rev. (Jan. 6, 2016), http://www.ifre.com/exclusive-the%20the%20DOJ-investigates-bond-traders-over-market-rigging/21230385.fullarticle (last viewed June 15, 2016).

9.     The Defendants in this action are among the largest dealers, or are among the most prominent traders, of SSA bonds. The bank Defendants act as market makers in the secondary market and compete for customers based on the prices they offer for the purchase and sale of SSA bonds.  Bond dealers typically quote bond prices to investors by providing them with their "bid" (buy) and "ask" (sell) prices. Generally, the smaller the "spread" (difference) between the bid and ask prices, the better and more competitive the prices are for customers. Bid and ask prices are usually set in terms of basis points, *i.e.,* 1/100th of one percent.

10.     As noted above, banks, including Defendants, also compete to underwrite SSA bond offerings. In connection with soliciting underwriting services, SSA bond issuers often favor those institutions that have demonstrated the ability to provide liquidity in the secondary market by trading large volumes of that issuer's bonds.

11.     Rather than compete with each other by offering narrower bid-ask spreads, however, from at least as early as January 1, 2005, Defendants colluded with each other to manipulate the prices at which they bought and sold SSA bonds in the secondary market.  In other words, they agreed to widen the bid-ask spreads they quoted to customers, thereby increasing the prices investors paid for the SSA bonds or decreasing the prices at which investors sold the bonds.  No one Defendant could afford to unilaterally widen its bid-ask prices without fearing the loss of trading business to its competitors.  Such action could also jeopardize a Defendant's ability to secure new underwriting business from SSA bond issuers in the future.

12.     The bank Defendants' traders orchestrated and maintained their conspiracy via regular electronic communications, including instant messaging and chat rooms.  Through such communications, these traders discussed their respective customers' identities and confidential information about the size and nature of their orders before deciding the prices that they would quote to their customers for SSA bonds.  These traders included Defendants Hiren Gudka, who

4

worked at Bank of America and Deutsche Bank; Bhardeep Singh Heer, who worked at Nomura; Amandeep Singh Manku, who worked at Bank of America and Crédit Agricole; and Shailen Pau, who worked at Credit Suisse. According to one major publication, Defendants' traders "created a new chat room each day to discuss activity and prices" in the SSA bond secondary market.[4]

13.     Defendants' conduct has drawn the scrutiny of U.S. and European regulators. The U.S. Department of Justice ("DOJ") launched an extensive investigation into Defendants' practices in the SSA bond market and has obtained – and is currently reviewing – transcripts of electronic chat rooms used by Defendants' SSA bond traders.  Similarly, the U.K. Financial Conduct Authority ("FCA") and the European Commission ("EC") have opened preliminary investigations into potential anticompetitive conduct in the SSA bond market.  The FCA is reportedly coordinating its investigatory efforts with the DOJ.  As a result of these investigations, the bank Defendants have either terminated or suspended at least four prominent SSA bond traders: Defendants Gudka, Heer, Manku, and Pau.

14.     Defendants' anticompetitive conduct has caused, and continues to cause, injury to Plaintiff and other investors of SSA bonds in the secondary market.  Defendants have inflated the prices at which they sold SSA bonds to investors and reduced the prices at which they purchased these bonds from investors, including Plaintiff and members of the Class.  Thousands of U.S.-based investors have purchased and sold billions of dollars' worth of SSA bonds directly from Defendants.  Plaintiff, on behalf of itself and all others similarly situated, seeks damages arising from Defendants' misconduct, trebled as provided by law, and injunctive relief, enjoining the continuation of the alleged misconduct.

---

[4] Abhinav Ramnarayan & Helene Durand, "EXCLUSIVE - DoJ investigates bond traders over market-rigging," Int'l Fin. Rev. (Jan. 6, 2016), http://www.ifre.com/exclusive-the%20the%20DOJ-investigates-bond-traders-over-market-rigging/21230385.fullarticle (last viewed June 15, 2016).

## CLASS ACTION ALLEGATIONS

15.     Plaintiff brings this action on behalf of itself and as a class action under Rules

23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking relief on behalf of the

following class (the "Class"):

> All persons or entities who purchased or sold SSA bonds in the
> secondary market directly from Defendants in the United States
> from at least as early as January 1, 2005 through the present (the
> "Class Period").  Excluded from the Class are Defendants, their
> employees, parent companies, subsidiaries and affiliates, any co-
> conspirators, whether or not named in this Complaint, and all
> federal governmental entities.

16.     The Class is so numerous and geographically dispersed that joinder of all

members is impracticable. Plaintiff believes that thousands of individuals and entities transacted

in SSA bonds directly with Defendants during the Class Period.

17.     Plaintiff's claims are typical of the claims of the other Class Members because

they all sustained damages arising out of Defendants' common course of conduct in violation of

the law as described in this Complaint.  The injuries and damages of each Class Member were

directly caused by Defendants' wrongful conduct.

18.     Plaintiff will fairly and adequately represent and protect the interests of the Class.

Plaintiff is an adequate representative of the Class and has no interests adverse to the interests of

absent Class Members.

19.     Plaintiff is represented by counsel who is competent and experienced in class

action litigation, including antitrust class action litigation.

20.     This case presents many common questions of law and fact that will predominate

over any questions that may affect individual members of the Class, including, but not limited to:

(a)      Whether Defendants engaged in a combination or conspiracy to fix, raise, maintain, stabilize and/or otherwise manipulate the prices for SSA bonds in the secondary market in violation of the Sherman Act;

(b)      The identity of the participants in the conspiracy;

(c)      The duration of the conspiracy;

(d)      The nature and character of the acts performed by Defendants in furtherance of the conspiracy;

(e)      Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the Class;

(f)      Whether Defendants fraudulently concealed the conspiracy from Plaintiff and the Class;

(g)      The appropriate injunctive and equitable relief for the Class; and

(h)      The appropriate measure of damages sustained by Plaintiff and the Class.

21.      Adjudicating the claims of Class Members as a class action is superior to other available methods because it allows for the fair and efficient adjudication of the controversy alleged in this Complaint, while avoiding the risk that the prosecution of separate actions by individual Class Members would create inconsistent or varying adjudications.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous, separate individual actions, or repetitive litigation would entail.  The Class is readily definable and is one for which records should exist in the files of Defendants, Class Members, or the public record. Class treatment will also permit the adjudication of relatively small claims by many Class Members who otherwise could not afford to litigate the

claims alleged herein, including those for antitrust. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26) and pursuant to 28 U.S.C. §§ 1331 and 1337(a).

23.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c), and (d) because during the Class Period all Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

24.     This Court has personal jurisdiction over each Defendant, because each Defendant transacted business during the Class Period throughout the United States, including in this District; had substantial contacts during the Class Period with the United States, including in this District; and/or committed overt acts during the Class Period in furtherance of the illegal scheme and conspiracy in the United States.

25.     In addition, the conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District, and Plaintiff's claims arise out of Defendants' conduct. Defendants' SSA bond traders dealt directly with U.S.-based investors, buying and selling SSA bonds from them in a continuous flow of interstate and foreign commerce.  Accordingly, Defendants' anticompetitive conduct had direct, substantial, and reasonably foreseeable effects on U.S. commerce.

26.     The activities of Defendants were within the flow of, were intended to, and did have a substantial effect on the interstate and foreign commerce of the United States.

**PARTIES**

*Plaintiff*

27.     Plaintiff Inter-Local Pension Fund Graphic Communications Conference of the International Brotherhood of Teamsters is a public retirement fund located in Carol Stream, Illinois and funded directly by participating members of the International Brotherhood of Teamsters.  The Pension Fund manages more than $1.0 billion in assets, and has more than 38,000 participants or beneficiaries.   The Pension Fund directly transacted in SSA bonds with one or more of the Defendants during the Class Period.  As a direct and proximate result of Defendants' collusive and manipulative activities, the Pension Fund was injured in its business or property.

*Bank of America Defendants*

28.     Defendant Bank of America Corporation is a Delaware corporation with its principal offices located at 100 North Tryon Street, Charlotte, North Carolina 28255. Bank of America Corporation is a multi-national banking and financial services corporation.

29.     Defendant Bank of America, N.A. is a banking and financial services firm with its principal place of business located at 100 North Tryon Street, Suite 170, Charlotte, North Carolina 28255. Bank of America, N.A. is registered with the New York Department of Financial Services ("NYDFS").

30.     Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. is a subsidiary of Bank of America, N.A., with its principal place of business located at 1 Bryant Park, New York, New York 10036.

31.     Defendant Bank of America Merrill Lynch International Limited is a subsidiary of Bank of America, N.A., with its principal place of business located at 2 King Edward Street, London EC1A 1HQ, United Kingdom.

32.     Defendants Bank of America Corporation, Bank of America, N.A., Merrill Lynch, Pierce, Fenner & Smith, Inc., Bank of America Merrill Lynch International Limited, and their subsidiaries and affiliates are collectively referred to herein as "Bank of America." During the Class Period, Bank of America purchased SSA bonds from, and sold SSA bonds to, members of the Class. During the Class Period, Bank of America employed Hiren Gudka and Amandeep Singh Manku, SSA bond traders who are under investigation by the DOJ.

*Crédit Agricole Defendants*

33.     Defendant Crédit Agricole S.A. is a corporation organized and existing under the laws of France with its principal place of business located at 12 place des Etats-Unis, Montrouge, Paris, Ile-de-France, France.

34.     Defendant Crédit Agricole Corporate and Investment Bank, part of the Crédit Agricole Group, is a banking entity headquartered at 9, quai du Président Paul Doumer, 92920 Paris La Défense Cedex, France.  Crédit Agricole is registered with NYDFS as a foreign branch and maintains offices located at 1301 Avenue of the Americas, New York, New York 10019. Crédit Agricole also maintains offices in London at Broadwalk House, 5 Appold Street, London EC2A 2DA, United Kingdom.

35.     Defendants Crédit Agricole S.A., Crédit Agricole Corporate and Investment Bank, and their subsidiaries and affiliates are collectively referred to herein as "Crédit Agricole." During the Class Period, Crédit Agricole purchased SSA bonds from, and sold SSA bonds to members of the Class. During the Class Period, Crédit Agricole employed Defendants Amandeep Singh Manku and Shailen Pau, SSA bond traders under investigation by the DOJ.

*Credit Suisse Defendants*

36.     Defendant Credit Suisse Group AG is a corporation organized and existing under the laws of Switzerland with its headquarters located at Paradeplatz 8, 8070 Zurich, Switzerland.

37.     Defendant Credit Suisse AG is a wholly owned subsidiary of Credit Suisse Group AG and is a banking entity organized and existing under the laws of Switzerland with its headquarters located at Paradeplatz 8, 8070 Zurich, Switzerland. Credit Suisse AG maintains a New York branch office located at 11 Madison Avenue, 24th Floor, New York, New York 10010, and offices in London at One Cabot Square, London E14 4QJ, United Kingdom. Credit Suisse is registered with the NYDFS.

38.     Defendant Credit Suisse International is a banking subsidiary of Credit Suisse Group AG, existing under the laws of the United Kingdom with its headquarters located at One Cabot Square, London E14 4QJ, United Kingdom.

39.     Defendant Credit Suisse Securities (USA) LLC is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 11 Madison Avenue, 24th Floor, New York, New York, 10010, and is a wholly owned subsidiary of Credit Suisse (USA), Inc., which is a subsidiary of Credit Suisse Group AG.

40.     Defendants Credit Suisse Group AG, Credit Suisse AG, Credit Suisse International, Credit Suisse Securities (USA) LLC, and their subsidiaries and affiliates are collectively referred to herein as "Credit Suisse." During the Class Period, Credit Suisse purchased SSA bonds from, and sold SSA bonds to, members of the Class.  During the Class Period, Credit Suisse employed Defendant Shailen Pau, an SSA bond trader who is under investigation by the DOJ.

*Deutsche Bank Defendants*

41.     Defendant Deutsche Bank AG is a banking entity with headquarters located at Taunusanlage 12, 60325 Frankfurt AM Main, Germany. Deutsche Bank AG maintains a New York foreign branch office located at 60 Wall Street, New York, New York 10005. Deutsche

Bank is registered with NYDFS.  Deutsche Bank also maintains offices in London at 1 Great

Winchester Street, London, EC2N 2DB, London, Great Britain.

42.     Defendant Deutsche Bank Securities Inc. is a corporation organized and existing

under the laws of the State of Delaware, with its principal place of business located at 60 Wall Street,

4th Floor, New York, New York 10005 and is an indirect wholly owned subsidiary of Deutsche Bank

AG.

43.     Defendants Deutsche Bank AG, Deutsche Bank Securities Inc., and their

subsidiaries and affiliates are collectively referred to herein as "Deutsche Bank." During the

Class Period, Deutsche Bank purchased SSA bonds from, and sold SSA bonds to, members of

the Class.  During the Class Period, Deutsche Bank employed Defendant Hiren Gudka, an SSA

bond trader who is under investigation by the DOJ.

*Nomura Defendants*

44.     Defendant Nomura International plc is a financial services company with its

principal place of business at 1 Angel Lane, London EC4R 3AB, United Kingdom.  Nomura

operates as a subsidiary of Nomura Europe Holdings plc.

45.     Defendant Nomura Holdings, Inc. is a Japan-based financial services company

located at 1-9-1 Nihonbashi, Chuo-ku, Tokyo 103-8645, Japan.

46.     Defendant Nomura Securities International, Inc., a wholly owned subsidiary of

Nomura Holding America Inc. (which is wholly owned by Nomura Holdings, Inc.), is a corporation

organized and existing under the laws of the State of New York, with its principal place of business

located at 309 W. 49th St., Worldwide Plaza, New York, New York 10019.

47.     Defendants Nomura International plc, Nomura Holdings, Inc., Nomura Securities

International, Inc., and their subsidiaries and affiliates are collectively referred to herein as

"Nomura." During the Class Period, Nomura purchased SSA bonds from, and sold SSA bonds

to, members of the Class. During the Class Period, Nomura employed Defendant Bhardeep Singh Heer, an SSA bond trader who is under investigation by the DOJ.

*Individual Traders*

48.     Defendant Hiren Gudka ("Gudka") is an individual residing in Middlesex, England. During the Class Period, Gudka purchased SSA bonds from, and sold SSA bonds to, members of the Class.  During the Class Period, Gudka was an SSA bond trader employed by Defendants Bank of America and Deutsche Bank.

49.     Defendant Bhardeep Singh Heer ("Heer") is an individual residing in Essex, England. During the Class Period, Heer purchased SSA bonds from, and sold SSA bonds to, members of the Class. During the Class Period, Heer was an SSA bond trader employed by Nomura.

50.     Defendant Amandeep Singh Manku ("Manku") is an individual residing in Essex, England.  During the Class Period, Manku purchased SSA bonds from, and sold SSA bonds to, members of the Class.  During the Class Period, Manku was an SSA bond trader employed by Bank of America and Crédit Agricole.

51.     Defendant Shailen Pau ("Pau") is an individual residing in London, England. During the Class Period, Pau purchased SSA bonds from, and sold SSA bonds to, members of the Class.  During the Class Period, Pau was an SSA bond trader employed by Credit Suisse and Crédit Agricole.

*Other Entities and Individuals*

52.     Various other entities and individuals unknown to Plaintiff at this time participated as co-conspirators in the acts complained of, and performed acts and made statements that aided and abetted and were in furtherance of the unlawful conduct alleged herein.

## FACTUAL ALLEGATIONS

### A.      Background of the SSA Bond Market

53.      Much like the U.S. Treasury borrows money by issuing bonds, supranational organizations, sub-sovereign entities, and government agencies issue bonds to raise capital.

54.      "Supranational debt" is debt issued by supranational organizations – entities created as a result of collaboration between foreign governments to serve a particular purpose. Supranational debt includes debt issued by the European Investment Bank ("EIB"); the International Finance Corporation ("IFC"), a member of the World Bank group; and the Asian Development Bank ("ADB").[5]

55.      Debt issued by national governments is called "sovereign debt."  Examples of sovereign debt include U.S. Treasury bills, notes, and bonds; French OATs (Obligations Assimilables du Tresor); and German Bunds.

56.      Debt issued by political subdivisions within a country is called "sub-sovereign debt."  Examples include debt issued by Canadian provinces or German states (Landers).

57.      "Agency debt" is debt issued by administrative bodies created by sovereign and sub-sovereign entities.  Examples include bonds issued by the French social security administration, Caisse d'Amortissement de la Delle Sociale ("CADES"); Dutch local government funding agencies Bank Nederlandse Germeeten ("BNG") and Nederlandse Waterschapsbank ("NEDWB"); Japan Bank for International Cooperation ("JBIC"); the German redevelopment bank, Kreditanstalt für Wiederaufbau ("KfW"); and Fannie Mae and Freddie Mac, two U.S. Government Sponsored Entities ("GSEs").

---

[5] *See* Matthew Cairns, "The SSA market: an investor primer," *Investment Essentials*, AXA Investment Managers – Research & Investment Strategy, Weekly Comment (June 28, 2012), at 2, https://www.axa-im.com/en/publications/-/news/research-research-and-strategy-weekly-ssa-market/maximized/k6Rb (last viewed June 22, 2016).

58.     Sub-sovereign and agency entities typically issue bonds in their local currency. However, these SSA bond issuers can and do issue debt in other currencies under certain circumstances, including the following:

(a)     SSA bond issuers may seek to take advantage of lower borrowing costs. For example, European SSA bond issuers may issue bonds in U.S. dollars because of lower costs associated with borrowing in U.S. dollars compared to borrowing in Euros.

(b)     Issuers may issue SSA bonds in U.S. dollars to diversify their investor base to include a broader number of U.S. investors.

(c)     Volatility in a local currency, which can lead to devaluation of the SSA bonds issued in that currency, may encourage an entity to issue debt in currencies with more stability (whether perceived or real). For example, if the Japanese government prints more Japanese yen, *i.e.*, increasing the money supply, in order to meet existing national debt obligations, the Japanese yen becomes less valuable relative to other currencies. This devaluation of the yen impacts investors of yen-denominated SSA bonds by potentially causing them to lose money in real terms, *i.e.*, relative to having invested in debt denominated in a different currency. Thus, to reduce this risk and attract a larger and broader base of investors, an entity may issue debt in other, less volatile currencies.

59.     Typically, the largest SSA bond issuers tend to issue bonds worth at least $1 billion in a single offering. For example, in January 2015, CADES issued $5 billion in SSA bonds to customers – $2.5 billion of which was underwritten by Defendants Deutsche Bank and Bank of America.[6]

---

[6] *See* CADES, Final Terms dated 28 January 2014, Issue of USD 5,000,000,000, 1.125 per cent, http://www.cades.fr/pdf/emprunts/uk/2014/FT_28janv2014.pdf (last viewed June 16, 2016).

60.     Banks, including Defendants, compete with each other to provide underwriting services for SSA bonds. An important criterion in an issuer's selection of an underwriter is the bank's ability to provide liquidity in the secondary market.  For example, an EIB official stated that "[l]ike all responsible issuers, we too monitor our secondary market liquidity and turnover. In other words, we also monitor trading performance of dealers."[7]  A former trader at one of the bank Defendants acknowledged: "Issuers conduct empirical measurements and publish a chart. They use these charts to award business . . . . So say, you are bank Z, you will get told by the issuer where you rank on that chart to incentivize you to do more secondary business."[8]  Thus, issuers often favor those banks with a proven track record of providing liquidity in the secondary market.

**B.     Pricing of SSA Bonds**

61.     Similar to other bonds, the prices of SSA bonds are stated in terms of the bond's par value, coupon, and maturity date.  A bond's par value is its face value, payable on the bond's maturity date.  A bond's coupon is the interest rate that the bond issuer must pay an investor. Coupons are paid to the bond-holder periodically – usually every 6 months, although that can vary – until the bond reaches maturity.

62.     Bond prices are generally quoted as a discount or premium to the bond's par value.  For example, a bond with a par value of $1,000 may sell at a discount of 2%, or $980.  A dealer selling this bond would provide its customer a quote of "98."  A bond may sell at a discount because its coupon is lower than prevailing interest rates in the marketplace, which

---

[7] Abhinav Ramnarayan & Helene Durand, "EXCLUSIVE - DoJ investigates bond traders over market-rigging," Int'l Fin. Rev. (Jan. 6, 2016), http://www.ifre.com/exclusive-the%20the%20DOJ-investigates-bond-traders-over-market-rigging/21230385.fullarticle (last viewed June 15, 2016).

[8] *Id*.

means that in order to sell it, the holder must lower the price of the bond to make it competitive with other bonds in the market.

63.     A bond's attractiveness can also be stated in terms of its yield.  Yield is a figure that shows the return that an investor receives by holding the bond to maturity.  Bond price and yield have an inverse relationship: lowering one will result in a rise in the other.

64.     This inverse relationship is due to the fact that a bond's price will be higher when it pays a coupon that is higher than prevailing interest rates.  As market interest rates increase, bond prices decrease.  Because yield takes into account both a bond's coupon and its price, yield can be an effective means to compare bonds with different coupons and prices.

65.     As a result of their relative safety, SSA bonds usually trade at a price that is comparable to sovereign debt.  In industry parlance, the price spread between SSA bonds and sovereign debt is known as a "safe spread" – *i.e.*, the incremental yield over the sovereign debt counterpart but with the potential for minimal additional credit risk.

66.     The risk premium associated with SSA bonds over their sovereign bond counterparts can depend on a number of factors, including the level of credit risk associated with the guarantor; the level of political risk faced by the issuer; and the level of inherent liquidity risk, which itself is determined with respect to the tenor, size, and currency mix of the SSA bonds.

## C.     Resale of SSA Bonds in the Secondary Market

67.     After the initial issuance of SSA bonds in the primary market, these bonds are further traded among bond dealers and investors, including pension, hedge, and mutual funds; domestic and international banks; insurance companies and other corporations; and state and local governments.  The resale of SSA bonds after the initial offering is known as the "secondary

market."  For the largest SSA bond issuers, there is an active secondary market, with billions of dollars' worth of SSA bonds changing hands during the lifetime of the bonds.

68.     Customers seeking to purchase or sell SSA bonds will contact one or more banks, such as Defendants (or a broker who then contacts one of the Defendants), and request pricing for a particular SSA bond.  The bank will quote the price for an SSA bond in terms of a "bid" price or an "ask" price.  The bid price represents the maximum price at which a dealer will purchase the SSA bond; the ask price represents the minimum price at which a dealer will sell the SSA bond.  The difference between these two values is the "bid-ask spread" (or "spread"), which reflects the dealer's profit for acting as a market maker and assuming the risk that it may be unable to purchase or sell the SSA bond in the future at better prices than it is offering at the time to its customer.

69.     As is typical in many financial markets, trading of SSA bonds is done through telephonic and, increasingly, electronic means.  Orders are taken by salespersons at dealers, which are then relayed to bond traders at the banks' trading desks so they can be filled.

70.     Defendants dominate the secondary market, acting as "market makers" that provide liquidity to investors by their willingness to buy and sell SSA bonds whenever an investor seeks to do so.

71.     Ideally, investors want to buy low and sell high. Banks and their bond traders, including Defendants, compete for customers based on the bid and ask prices they offer, and, in turn, the spread between them.  The narrower the bid-ask spread, the more competitive the prices.  A bank can gain customers and business by offering a narrower bid-ask spread than its competitors.  Conversely, if a bank widens the bid-ask spread – by either lowering the bid price or raising the ask price – it would likely lose customers to rivals offering tighter spreads.  Only

through collusion could a dealer quote a wider spread than market conditions otherwise dictate without losing market share and profits.

### D. SSA Bonds Are Often Highly Rated

72.     SSA bonds are generally regarded as highly secure investments, and SSA bond issuers are generally characterized by having "well-diversified, high performing portfolio of assets with . . . strong capital ratios and healthy liquidity buffers."[9]

73.     Moreover, SSA bond issuers typically enjoy special legal status that, in effect, links the creditworthiness of the SSA bond issuer to that of its sovereign, in the case of a sub-sovereign or agency issuer, or in the case of a supranational issuer, to a group of sovereigns or institutional shareholders.[10] For example, certain German entities, such as KfW, benefit from statutory guarantees (Gewährträgerhaftung) that give creditors the right to lodge a claim directly against the German federal government.[11]  Similarly, certain French lending institutions are considered Établissements Publics ("EPs"), which are fully owned and controlled by the French government.  This means EPs cannot enter bankruptcy and their debts, while not legally guaranteed by the French government, are "deemed so strong that the[ir] ratings . . . are equalized with the ratings of the Republic of France."[12]

---

[9] Richard McGuire, *et al.*, SSA Market Primer, Rabobank (Sept. 12, 2014), at 1, https://services.rabobank.com/publicationservice/download/publication/token/8Bk4hP2kspd6u3yRhdP5 (last viewed June 24, 2016).

[10] *See id.* at 2-3

[11] *See* Jacob Ejsing, *et al.*, *Liquidity and Credit Risk Premia in Government Bond Yields*, at 7, European Central Bank Work Paper Series No. 1440 (June 2012), https://www.ecb.europa.eu/pub/pdf/scpwps/ecbwp1440.pdf?1232475cd6cb5e3a32228b6c232a50be (last viewed June 16, 2016).

[12] *Id*; UniCredit, Credit Research Sector Report, European agency issuers, at 47 (July 11, 2012), https://www.research.unicreditgroup.eu/DocsKey/credit_docs_2012_127792.ashx?EXT=pdf&KEY=n03ZZLYZf5l2 PWPsZLYmHxhN_xtR5xjJRGd7ZgDqzHs= (last viewed June 16, 2016).

74.     As a result of both explicit and implicit guarantees on their debt, SSA bond issuers enjoy very high credit ratings, and their bonds are considered "investment grade," *i.e.*, low risk of default.

75.     Standard & Poor's ("S&P") and Moody's, two leading credit rating agencies, rate SSA bond issues.  A bond is considered investment grade if its credit rating is "BBB-" or higher by S&P, or "Baa3" or higher by Moody's.

**E.     Increased Popularity of SSA Bonds**

76.     Recent global economic crises and the consequent aversion for investment risk have resulted in the SSA bond market becoming an increasingly important sector within the overall bond market because of SSA bonds' relatively low risk profiles.  Indeed, investor demand for SSA bonds has increased steadily between 2005 and the present, with the SSA bond market tripling in size over the period 2005-2012.

77.     SSA bonds have remained a popular investment, and more recently, there has been an increased demand specifically for U.S. dollar-denominated SSA bonds.

78.     This demand likely derived from several conditions.  First, the European sovereign debt crisis jeopardized the solvency of certain countries and triggered fears of contagion throughout the euro zone.  Second, even relatively healthy euro zone countries, such as Germany, sustained low interest rates from the European Central Bank, which were coupled with the lingering threat of deflation (a period of sustained price decline in response to slack demand in the market).  Deflation worsens the position of debtors like SSA bond issuers because it raises the inflation-adjusted value of their debts.  Thus, while their debt amount remains the same, because the cost of everything is less, SSA bond issuer revenues are reduced, making their debts harder to pay off in real terms.

79.     As a result, many European entities found that issuing SSA bonds in U.S. dollars provided greater economic opportunities – both in terms of funding costs and generating investor appetite.  Indeed, CADES, a French SSA bond issuer, noted that conditions created a "favorable cross-currency basis swap [between U.S. dollars and euros that] has allowed us to swap the proceeds back into euros to achieve very attractive all-in funding costs."[13]

### DEFENDANTS' ANTICOMPETITIVE CONDUCT

80.     The bank Defendants are among the world's largest traders of SSA bonds in the secondary market and act as market makers for these instruments.

81.     In a competitive market, Defendants compete with each other for customers seeking to buy and sell SSA bonds as well as to provide underwriting services for SSA bond issuers.  As explained above, issuers often select underwriters based on their ability to provide liquidity in the secondary market.

82.     However, rather than compete with each other, Defendants and their traders entered into an illegal scheme to fix and otherwise manipulate the bid-ask spreads for SSA bonds sold to investors.  This scheme had the same effect as fixing the prices at which investors bought and sold SSA bonds in the secondary market.  Defendants' conduct ensured that investors received non-competitive prices for their secondary market SSA bond trades.

83.     Defendants' scheme was driven by greed and opportunity.  As one SSA bond trader acknowledged: "if you can speak to another trader and agree to sell a bond at a certain price and not below, then that makes a big difference."[14]  Others noted that the collaborative

---

[13] Philip Moore, "In a Turbulent SSA Bond Market, Buyers Seek Better Spreads," *Institutional Investor*, at 3 (June 2015), http://www.institutionalinvestor.com/images/416/Special%20Reports/FrequentBorrowers.pdf (last viewed June 16, 2016).
[14] Abhinav Ramnarayan & Helene Durand, "EXCLUSIVE – DoJ investigates bond traders over market-rigging," Int'l Fin. Rev. (Jan. 6, 2016), http://www.ifre.com/exclusive-the%20the%20DOJ-investigates-bond-traders-over-market-rigging/21230385.fullarticle (last viewed June 15, 2016).

nature of underwriting in the primary market may have encouraged collusion in the secondary market:  "[O]nce banks are mandated [to perform underwriting services] they have to work together . . . . Given the collegia[l] nature, people might talk about things that they shouldn't."[15]

84.     Absent an agreement to fix bid and ask prices, no one Defendant could unilaterally afford to widen its bid-ask spread.  To do so would result in a Defendant losing substantial trading business to competitors who offered more competitive pricing.  That loss could also jeopardize a Defendant's ability to secure new underwriting business from SSA bond issuers in the future. One syndicate head stated that there was considerable pressure on SSA bond traders to perform, and that this may have "creat[ed] the motivation and opportunity for market rigging."[16]

85.     According to those familiar with Defendants' misconduct, Defendants' SSA bond traders communicated with each other about their respective customers' SSA bond purchase and sell orders via electronic means including, but not limited to, instant messaging and electronic chat rooms.

86.     In these communications, Defendants' traders exchanged confidential information about their customers' identities, trading habits, and order sizes.  The exchange of this sensitive customer information enabled Defendants' traders to coordinate the bid and ask prices they offered to their respective customers.

87.     Bond traders in the SSA bond market communicated with each other frequently. According to news reports, "the use of permanent Bloomberg chat rooms within market sectors

---

[15] Craig McGlashan, *et al.*, "'Forced competition' to generate trading flow under fire for fomenting SSA scandal," Global Capital (Jan. 7, 2016), http://www.globalcapital.com/article/vz0phyg7g5jt/39forced-competition39-to-generate-trading-flow-under-fire-for-fomenting-ssa-scandal (last viewed June 21, 2016).
[16] *Id.*

was commonplace in the City [of London]."[17]  One SSA bond trader interviewed stated that bond

traders "created a new chat room each day to discuss activity and prices."[18]  The repetitious

nature of Defendants' chat room discussions not only enabled them effectively to coordinate bid

and ask prices and spreads, but also to provide an effective means of policing their conspiracy.

A Defendant who failed to adhere to agreed-upon pricing could quickly be identified and barred

from any further participation in the chat rooms.  Accordingly, Defendants' SSA bond traders

had little incentive to cheat.

88.     Members of these chat rooms included at least the following Defendant SSA bond

traders: Gudka of Bank of America (and formerly of Deutsche Bank); Heer of Nomura; Manku

of Crédit Agricole (and formerly of Bank of America); and Pau of Credit Suisse (and formerly of

Crédit Agricole). Each trader Defendant lived in London or its suburbs, and some worked in the

same bank Defendants' London offices.  For example, Gudka and Manku both worked at Bank

of America's London offices at its bond desk during the Class Period.  Similarly, Manku and Pau

both worked at Crédit Agricole during the Class Period.  Prior to their departures, these

individuals were major SSA bond traders, with one head bond trader stating that "[t]hey were

experienced people, especially Hiren Gudka who was a big name in this market."[19]

89.     By communicating with each other about aligning the prices and spreads they

would quote to investors, Defendants also discouraged investors from aggressively comparing

prices.  Shopping around for better pricing was ultimately a pointless endeavor because the

---

[17] Abhinav Ramnarayan & Helene Durand, "EXCLUSIVE - DoJ investigates bond traders over market-rigging," Int'l Fin. Rev. (Jan. 6, 2016), http://www.ifre.com/exclusive-the%20the%20DOJ-investigates-bond-traders-over-market-rigging/21230385.fullarticle (last viewed June 15, 2016).
[18] Id.
[19] Craig McGlashan, et al., "'Forced competition' to generate trading flow under fire for fomenting SSA scandal," Global Capital (Jan. 7, 2016), http://www.globalcapital.com/article/vz0phyg7g5jt/39forced-competition39-to-generate-trading-flow-under-fire-for-fomenting-ssa-scandal (last viewed June 21, 2016).

quotes received from one Defendant would be identical to those offered by the other Defendants. From the customer's perspective, the matching quotes would suggest that the prices offered by any one Defendant was a competitive market price. Unbeknownst to the customer, however, these prices were actually the product of back-channel collusion between Defendants' traders.

90.     Further, given Defendants' individual and collective market power in the secondary market for SSA bonds, their fixing of the SSA bond bid and ask prices left customers that sought to purchase or sell these instruments little choice but to accept the artificially widened bid-ask spreads on their SSA bond transactions.

91.     The tools used by Defendants to orchestrate their conspiracy are strikingly similar to those used by major foreign exchange ("FX") dealer banks that have been accused of – and in some cases pleaded guilty to – manipulating the FX market. In the FX market, regulators and government enforcers found that FX traders at major dealer banks used electronic means, including instant messaging and chat rooms, to discuss and implement collective trading strategies to move key FX benchmarks and trigger customer stop-loss and limit orders. These FX traders were further found to have used these platforms to discuss and fix the spreads of certain FX transactions quoted to customers.

92.     As a result of Defendants' price-fixing scheme, investors, including Plaintiff and the Class, paid supracompetitive prices for SSA bonds in the secondary market and, as a result, suffered injury to their business or property.

### GOVERNMENT INVESTIGATIONS OF THE SSA BOND MARKET

93.     In December 2015, *Bloomberg* reported that the DOJ is "examining possible manipulation in the trading of agency bonds."[20]  Significantly, sources close to the investigation

---

[20] David McLaughlin & Tom Schoenberg, "U.S. Said to Probe Possible Rigging in Agency Bond Market," *Bloomberg* (Dec. 9, 2015), http://bloom.bg/1RaD1OR (last viewed June 16, 2016).

have told *Bloomberg* reporters that the DOJ's investigation is criminal in nature.  The DOJ

officials investigating the matter "are focusing on activity by London-based traders" and are

examining "whether the traders at different banks coordinated with each other before deciding

who would offer price quotes to potential buyers and sellers."[21]  Later reports stated that the DOJ

"is investigating allegations that SSA bond traders at different banks agreed [on] prices and

shared information on certain US dollar bonds in chat rooms they established for that purpose."[22]

94.     Pursuant to its investigation, the DOJ "obtained transcripts of online chat-room

conversations indicating possible misconduct and asked banks to delve further into the

behavior."[23]  Specific trader Defendants under investigation include Gudka (of Bank of America

and Deutsche Bank); Heer (of Nomura); Manku (of Crédit Agricole and Bank of America); and

Pau (of Credit Suisse and Crédit Agricole).

95.     In addition to the DOJ's investigation, the FCA and EC have also begun their own

preliminary inquiries into the manipulation of the SSA bond market.  The FCA is reportedly

working closely with the DOJ to coordinate their respective investigations.  The EC's

investigation reportedly started at the same time as the DOJ's investigation.

96.     Certain Defendants have acknowledged the regulatory inquiries into their SSA

bond market operations.  For example, in its 2015 annual report, Crédit Agricole disclosed that

"[s]everal regulators have demanded information" from Crédit Agricole regarding the "activities

of different banks" in the SSA bond market. Crédit Agricole confirmed that it was in the process

of collecting and producing documents pursuant to regulatory demands and that this process

---

[21] *Id.*

[22] Abhinav Ramnarayan & Helene Durand, "EXCLUSIVE - DoJ investigates bond traders over market-rigging," Int'l Fin. Rev. (Jan. 6, 2016), http://www.ifre.com/exclusive-the%20th%20DOJ-investigates-bond-traders-over-market-rigging/21230385.fullarticle (last viewed June 15, 2016).

[23] Suzi Ring & Tom Schoenberg, "U.K. Said to Open Probe Into Rigging of Agency-Bonds Market," *Bloomberg* (Jan. 20, 2016), http://bloom.bg/1NjWIfO (last viewed June 16, 2016).

would continue through 2016.[24]  The other bank Defendants are reportedly cooperating with regulators and have provided chat and email records to them.

97.     Further, regulatory scrutiny of price-fixing conduct has resulted in Defendants terminating or suspending several SSA bond traders, including those named as Defendants in this Complaint – Credit Suisse terminated Pau in October 2015; Nomura suspended Heer; and, Gudka of Bank of America and Manku of Crédit Agricole both abruptly left their positions in November 2015 and December 2015, respectively.

## DEFENDANTS' SIMILAR MISCONDUCT IN OTHER FINANCIAL MARKETS SUPPORTS THE PLAUSIBILITY OF THEIR MANIPULATION OF SSA BONDS

98.     Defendants' conduct in this case is part of a larger set of revelations emerging about similar manipulation, collusion, and other anticompetitive conduct uncovered in various financial markets.

99.     Indeed, many of these same Defendants, along with numerous other dealer banks, have been implicated in or found liable for price-fixing schemes involving other financial products and benchmarks, including various Interbank Offered Rates (*e.g.*, LIBOR), in the FX market, Euro interest rate derivatives, Swiss Franc derivatives, and credit default swaps.  Further, the methods employed to fix prices in these markets – communications between competing traders through telephone, electronic chat rooms, and instant messaging – are strikingly similar to those employed by Defendants' SSA bond traders as alleged in this Complaint.

### A.     LIBOR and EURIBOR

100.     Several banks, including Defendant Deutsche Bank, have also been implicated in (and either admitted liability for or pleaded guilty to) coordinating and submitting deliberately

---

[24] Credit Agricole Group Financial Statements 2015, at 213, http://www.credit-agricole.com/en/content/download/316516/5043376/version/8/file/CAG_ACTU_2015_DRF_VA_VMEL.pdf (last viewed June 16, 2016).

false quotes in connection with the setting of various Interbank Offered Rates, including the

London Interbank Offered Rate ("LIBOR") and the European Interbank Offered Rate

("EURIBOR").  Total fines in connection with criminal and civil investigations have exceeded

$9 billion.

101.    On December 4, 2013, the EC fined Defendant Deutsche Bank, together with five

other banks, over €1.7 billion ($2.31 billion, at the time of the fine) in connection with rigging

various Interbank Offered Rates, including Yen LIBOR and EURIBOR.  In connection with its

participation in two cartels to manipulate the values of Yen LIBOR and EURIBOR, Defendant

Deutsche Bank was fined €725.4 million ($982.92 million).

102.    Joaquin Almunia, then-European Commission Vice-President in charge of

competition policy, said:

> What is shocking about the LIBOR and EURIBOR scandals is not
> only the manipulation of benchmarks, which is being tackled by
> financial regulators worldwide, but also the collusion between
> banks who are supposed to be competing with each other. . . .
> Healthy competition and transparency are crucial for financial
> markets to work properly, at the service of the real economy rather
> than the interests of a few.[25]

103.    More recently, Defendant Deutsche Bank entered into a deferred prosecution

agreement with the DOJ, in which it accepted criminal responsibility for engaging in wire fraud

and price-fixing in violation of the Sherman Act, 15 U.S.C. § 1.  The DOJ found that Deutsche

Bank employees, along with their co-conspirator counterparts at other banks, "engaged in efforts

to move [the LIBOR and EURIBOR] benchmark rates in a direction favorable to their trading

---

[25] European Commission Press Release, "Amended - Antitrust: Commission fines banks €1.49 billion for
participating in cartels in the interest rate derivatives industry" (Dec. 4, 2013), http://europa.eu/rapid/press-
release_IP-13-1208_en.htm (last viewed June 16, 2016).

positions."[26]  As part of its non-prosecution agreement, Deutsche Bank agreed to pay $625 million in fines.[27] Deutsche Bank admitted that it colluded with other banks to manipulate LIBOR submissions and that its "employees engaged in this misconduct through face-to-face requests, electronic communications, which included both emails and electronic chats, and telephone calls."[28]

104.    In connection with the DOJ's investigation of Deutsche Bank, a Deutsche Bank subsidiary also pleaded guilty to one count of wire fraud in connection with Deutsche Bank's manipulation of LIBOR and EURIBOR.  This subsidiary was assessed a $150 million criminal penalty.[29] Additional penalties against Deutsche Bank were assessed by the U.S. Commodity Futures Trading Commission ("CFTC") ($800 million); New York Department of Financial Services ($600 million); and the FCA ($344 million).  Other dealer banks have similarly pleaded guilty to criminal charges and/or paid massive civil penalties to U.S. and foreign authorities in connection with charges relating to LIBOR and/or EURIBOR manipulation.

### B.    FX Market

105.    Numerous banks, including Defendant Bank of America, were recently fined over $10 billion by various enforcers throughout the world stemming from the banks' conspiracy to manipulate FX benchmarks as well as to fix the bid-ask spreads on FX transactions.  The conduct some of these banks have admitted to perpetrating includes agreeing to fix the spreads on customer FX transactions; agreeing to enter into trading strategies to manipulate benchmark

---

[26] DOJ Press Release, "Deutsche Bank's London Subsidiary Agrees to Plead Guilty in Connection with Long-Running Manipulation of LIBOR" (Apr. 23, 2015), http://www.justice.gov/opa/pr/deutsche-banks-london-subsidiary-agrees-plead-guilty-connection-long-running-manipulation (last viewed June 16, 2016).
[27] *See id*.
[28] *Id*.
[29] *See* Plea Agreement between the DOJ and DB Group Services UK Limited, at ¶17, *United States v. DB Group Srvs UK Limited*, http://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/04/23/dbgs_plea_agreement.pdf (last viewed June 16, 2016).

prices; disclosing confidential customer order information and trading positions; adjusting trading positions to accommodate the interests of the collective group; and trading to trigger customers' limit orders or customers' barrier options for the bank's benefit and to the detriment of those customers.

106.    The Office of the Comptroller of the Currency ("OCC") and the Federal Reserve Board ("Fed") found that Bank of America's FX traders in the FX spot market routinely communicated with FX traders at other financial institutions through chat rooms.  These traders shared confidential customer and proprietary bank information with other FX traders, including customer order flows and bid-ask spreads, and coordinated trading strategies to manipulate spot FX reference rates for their benefit and to the detriment of their customers.  The traders also triggered customer stop-loss and limit orders for their own benefit and to the detriment of their customers.  In addition, Bank of America's FX traders were found to have engaged in questionable trading strategies, including front-running client orders that raised "potential conflicts of interest."  Bank of America was found to have failed to employ internal policies and procedures that would have enabled them to detect these significant issues.  For these activities, Bank of America was fined and paid $600 million.

107.    Defendants Bank of America, Credit Suisse, and Deutsche Bank are also named as defendants in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-cv-7789 (S.D.N.Y.), where plaintiffs allege that defendants fixed the bid-ask spreads on FX transactions quoted to customers. Defendant banks' FX traders participated in several electronic chat rooms to discuss and coordinate their FX trading strategies and price-fixing conspiracy. In addition, Bank of America, Credit Suisse, and Deutsche Bank are alleged to have suspended certain senior FX traders as a result of their participation in these chat rooms.  Bank of America settled the class allegations against it for $180 million.

### C.  Euro Interest Rate Derivatives

108.    On May 20, 2014, the EC issued a Statement of Objections against Defendant

Crédit Agricole and two other banks because of a suspected "breach[] [of] EU antitrust rules by

colluding to influence the pricing of interest rate derivatives denominated in the euro

currency."[30]  The EC's investigation is ongoing.

### D.    Swiss Franc Derivatives Bid-Ask Spread

109.    On October 21, 2014, the EC imposed fines of nearly €32.4 million ($41.2 million

at the time of the fines) against Defendant Credit Suisse and three other banks.  The EC found

that between May 2007 and September 2007, Credit Suisse, together with other banks, "agreed

to quote to all third parties wider, fixed bid-ask spreads on certain categories of short term over-

the-counter Swiss franc interest rate derivatives, whilst maintaining narrower spreads for trades

among themselves."[31]

110.    The purported aim of the cartel was to "lower the parties' own transaction costs

and maintain liquidity between them whilst seeking to impose wider spreads on third parties.

Another objective of the collusion was to prevent other market players from competing on the

same terms as these four major players in the Swiss franc derivatives market."[32]

### E.    Credit Default Swaps

111.    Defendants Bank of America, Credit Suisse, and Deutsche Bank, among other

banks, were also named as defendants in *In re Credit Default Swaps Antitrust Litigation*, No. 13-

md-2476 (S.D.N.Y.), where plaintiffs allege that defendants colluded to prevent the development

---

[30] European Commission Press Release, "Antitrust: Commission sends Statement of Objections to Credit Agricole,
HSBC, and JPMorgan for suspected participation in euro interest rate derivatives cartel" (May 20, 2014),
http://europa.eu/rapid/press-release_IP-14-572_en.htm (last viewed June 16, 2016).
[31] European Commission Press Release, "Antitrust: Commission settles cartel on bid-ask spreads charged on Swiss
Franc interest rate derivatives; fines four major banks € 32.3 million" (Oct. 21, 2014), http://europa.eu/rapid/press-
release_IP-14-1190_en.htm (last viewed June 16, 2016).
[32] *Id*.

of exchange-traded platforms for CDS in order to maintain supracompetitive bid-ask spreads on CDS purchased from and sold to investors.

112.    Recently, Bank of America, Credit Suisse, and Deutsche Bank resolved these allegations, settling with plaintiffs and a class of investors for $90 million, $159 million, and $120 million, respectively.

## DEFENDANTS FRAUDULENTLY CONCEALED THEIR MISCONDUCT

113.    Defendants concealed their wrongdoing in manipulating the prices of SSA bonds sold to investors.  Thus, the statutes of limitations relating to the claims for relief alleged below were tolled due to Defendants' affirmative acts of concealment and the inherently self-concealing nature of their private, unregulated conduct.

114.    Defendants' success in concealing their collusion was facilitated by their tremendous control over the market for SSA bonds.

115.    Neither Plaintiff nor Class Members knew of Defendants' unlawful and self-concealing manipulative acts and could not have discovered them by the exercise of reasonable due diligence, if at all, at least prior to public reports disclosing the DOJ's investigation of the SSA bond market.  Plaintiff and the Class also lacked any basis for identifying the wrongdoers or calculating damages before that date.  Indeed, Defendants' collusive activities were so well hidden that regulators in the United States and elsewhere remained unaware of such conduct for years.

116.    Only after recent public reports disclosed the DOJ's investigation of the SSA bond market did Plaintiff have a sufficient basis to investigate Defendants' possible collusion in the SSA bond market.

117.    Reasonable due diligence could not have uncovered the conspiracy because (i) Defendants' trading positions and trading strategies in the SSA bond market are not publicly

available; (ii) the bilateral, non-exchange traded nature of SSA bond transactions makes observing anticompetitive behavior in that market exceedingly difficult; (iii) the highly specialized and esoteric nature of the different aspects of the SSA bond market make it exceedingly difficult for an ordinary person to assess improprieties; and (iv) neither Defendants nor their co-conspirators told Plaintiff or other Class Members that they were conspiring to fix, stabilize, maintain, and/or otherwise manipulate the prices of SSA bonds.

118.   Defendants also took active steps to conceal evidence of their misconduct from Plaintiff, the Class, government regulators, and the public by, among other things: (i) holding out their activities in the SSA bond market as good faith market-making conduct; (ii) maintaining the secrecy of their price-fixing scheme; (iii) avoiding any discussion in public fora regarding their collusive activities and manipulation of SSA bond prices; and (iv) using non-public proprietary electronic communication platforms (*e.g.*, instant messaging, electronic chat rooms, etc.) to coordinate trading strategies.

119.   In addition, Defendants also failed to have the proper internal controls in place to detect misconduct concerning price-fixing of SSA bonds.  Such internal failures made it all the more difficult for Plaintiff, the Class, government regulators, and the public to become aware of Defendants' and their co-conspirators' misconduct.

120.   As a result of Defendants' affirmative steps to conceal their improper conduct; their willful decision not to put in place proper controls to detect improper conduct; the self-concealing nature of the price-fixing conspiracy; and the resulting lack of public information about material aspects of the conspiracy, collusion, and trading based on nonpublic information, the statutes of limitations were tolled for Plaintiff's claims.

## CAUSE OF ACTION – VIOLATION OF SHERMAN ACT § 1

## CONTRACT, COMBINATION, OR CONSPIRACY IN RESTRAINT OF TRADE

121.    Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

122.    Beginning at least as early as January 1, 2005, and continuing thereafter to the present, Defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, engaged in a continuing agreement, understanding and conspiracy, the purpose and effect of which were to artificially raise, fix, maintain, stabilize, or otherwise manipulate the price of SSA bonds purchased or sold in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

123.    During the Class Period, Defendants entered into an agreement to reduce competition among themselves by fixing and manipulating SSA bond prices sold in the United States and elsewhere.

124.    This conspiracy to manipulate SSA bond prices caused injury to both Plaintiff and the Class by depriving them of the benefit of competitive SSA bond prices reflecting true market conditions for some period during and following Defendants' unlawful conduct, and thus Plaintiff and the Class received, upon execution of their trades, less in value than they would have received absent Defendants' wrongful conduct.

125.    The conspiracy is a per se violation of Section 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the SSA bond market.  There is no legitimate business justification for, or pro-competitive benefits from, Defendants' conduct.  Furthermore, any business justification is outweighed by the anticompetitive effects of Defendants' conduct.

126.     As a direct and proximate result of Defendants' violation of Section 1 of the

Sherman Act, Plaintiff and the Class have been injured in their business and property throughout

the Class Period.

127.     Accordingly, Plaintiff and the Class seek damages, to be trebled pursuant to

federal antitrust law, and costs of suit, including reasonable attorneys' fees. Plaintiff and the

Class are also entitled to injunctive and other equitable relief, pursuant to 15 U.S.C. § 26.

## DEMAND FOR JURY TRIAL

128.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands

a jury trial as to all issues triable by a jury.

## PRAYER FOR RELIEF

129.     Wherefore, Plaintiff demands judgment against Defendants as follows:

(a)     That the Court certify this lawsuit as a class action under Rules 23(a), (b)(2), and

(b)(3) of the Federal Rules of Civil Procedure, that Plaintiff is designated as a class

representative, and that Plaintiff's counsel is appointed as counsel for the Class;

(b)     That the unlawful conduct alleged in this Complaint be adjudged and decreed to

violate Section 1 of the Sherman Act;

(c)     That Defendants are permanently enjoined and restrained from continuing and

maintaining the conspiracy alleged in the Complaint and that the Court direct such other

equitable relief as may be appropriate;

(d)     That the Court award Plaintiff and the Class damages against Defendants for their

violations of federal antitrust laws, in an amount to be trebled in accordance with such laws, plus

interest;

(e)     That the Court award Plaintiff and the Class their costs of suit, including

reasonable attorneys' fees and expenses, as provided by law; and

(f)     That the Court directs such further relief as it may deem just and proper.


Dated:   June 27, 2016                          **SPECTOR ROSEMAN KODROFF**
                                                **& WILLIS, P.C.**

                                                _____

                                                Robert M. Roseman
                                                Eugene A. Spector
                                                William G. Caldes
                                                Rachel E. Kopp
                                                1818 Market Street, Suite 2500
                                                Philadelphia, PA  19103
                                                Tel:    215. 496.0300
                                                Fax:    215.496.6611
                                                rroseman@srkw-law.com
                                                espector@srkw-law.com
                                                bcaldes@srkw-law.com
                                                jjagher@srkw-law.com
                                                rkopp@srkw-law.com

                                                Brian Murray
                                                Lee Albert
                                                **GLANCY PRONGAY**
                                                **& MURRAY LLP**
                                                122 E. 42nd Street, Suite 2920
                                                New York, NY  10168
                                                Tel:    212. 682.5340
                                                bmurray@glancylaw.com
                                                lalbert@glancylaw.com

                                                Steven A. Kanner
                                                **FREED KANNER LONDON**
                                                **& MILLEN LLC**
                                                2201 Waukegan Road, Suite 130
                                                Bannockburn, IL  60015
                                                Tel:    224.632.4500
                                                skanner@fklmlaw.com

Garrett D. Blanchfield
Roberta A. Yard
**REINHARDT WENDORF &
BLANCHFIELD**
E-1250 First National Bank Bldg.
332 Minnesota Street
St. Paul, MN  55101
Tel:     651.287.2100
g.blanchfield@rwblawfirm.com
r.yard@rwblawfirm.com

Vincent J. Esades
**HEINS MILLS &OLSON, P.L.C.**
310 Clifton Avenue
Minneapolis, MN  55403
Tel:     612.338.4605
vesades@heinsmills.com

David P. McLafferty
**LAW OFFICES OF DAVID P.
MCLAFFERTY & ASSOCIATES, P.C.**
923 Fayette Street
Conshohocken, PA  19428
Tel:     610.940.4000
dmclafferty@mclaffertylaw.com

Jeffrey S. Goldenberg
**GOLDENBERG SCHNEIDER, LPA**
35 East Seventh Street, Suite 600
Cincinnati, OH  45202
Tel:     513. 345.8291
jgoldenberg@gs-lega.com

W. Joseph Bruckner
**LOCKRIDGE GRINDAL NAUEN
P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN  55401
Tel:     612.339.6900
wjbruckner@locklaw.com

R. Alexander Saveri
**SAVERI & SAVERI, INC**.
706 Sansome Street
San Francisco, CA  94111
Tel:     415.217.6810
rick@saveri.com

36

Steven J. Greenfogel
Katrina Carroll
**LITE DEPALMA GREENBERG, LLC**
570 Broad Street, Suite 1201
Newark, NJ  07102
Tel:  973. 623.3000
sgreenfogel@litedepalma.com
KCarroll@litedepalma.com

Steven N. Williams
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcom Road, Suite 200
Burlingame, CA  94010
Tel:     650.697.6000
swilliams@cpmlegal.com